Filed 5/15/23  P. v. Trujillo CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>RENE PRECIADO TRUJILLO,<br><br>      Defendant and Appellant. | F084084<br><br>(Super. Ct. No. 4006912)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Rene Preciado Trujillo was charged with, and found guilty by a jury of, five counts related to an attack on a woman in the early hours of March 31, 2018: kidnapping during a carjacking (Pen. Code § 209.5, subd. (a); count II);[1] kidnapping with intent to commit sexual penetration (§ 209, subd. (b)(1); count III); assault with intent to commit sexual penetration by force, copulation by force, or rape by force (§ 220, subd. (a)(1); count IV); felony assault likely to produce great bodily injury (§ 245, subd. (a)(4); count V); and felony criminal threats (§ 422, subd. (a); count VI). The jury deadlocked on one count of oral copulation by force (former § 288a, subd. (c)(2)(A); count I)[2], a mistrial was declared as to that charge, and count I was dismissed after trial.

The trial court sentenced defendant to a determinate term as follows: the upper term of six years on count IV, a consecutive one-year term on count V (one-third the three-year middle term), and a consecutive term of eight months on count VI (one-third the two-year middle term). The trial court also imposed an indeterminate term of life with the possibility of parole on count II; followed by life with the possibility of parole on count III, but stayed the sentence pursuant to section 654. The aggregate sentence imposed was seven years eight months determinate, followed by a term of life with the possibility of parole.

Defendant argues the untimely disclosure during trial of missing pages of a nurse's report violated federal and state law, including his due process rights pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), and the trial court erred in failing to grant his motion for a mistrial based on these errors. Defendant also maintains the upper term sentence on count IV was unlawfully imposed under section 1170. The People dispute

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  Former section 288a was amended and renumbered as section 287, effective January 1, 2019. (Stats. 2018, ch. 423, § 49.)

the trial court erred in refusing to grant a mistrial, but concede error in the imposition of the upper term sentence.

For the reasons explained *post,* the convictions are affirmed, but we remand for resentencing. We conclude the trial court did not err in denying defendant's request for a mistrial. The prosecution's delayed disclosure did not constitute a prejudicial error of federal or state law, and it did not cause any incurable prejudice that only a mistrial could properly address. As for the upper term sentence imposed, it was not supported by any aggravating circumstances proven or established in conformity with section 1170 and resentencing is required.

**FACTUAL BACKGROUND**

## I.      The Prosecution's Case

According to her trial testimony, on Friday evening March 30, 2018, Jane made plans to meet with two friends in downtown Turlock to "hang out." Between 9:00 and 10:00 p.m., she parked in front of a restaurant/bar called the Dust Bowl; her friends, S.C. and J.E., were already inside the restaurant. Since the restaurant had closed by the time Jane arrived, the three walked to a place called Memo's where Jane had a Moscow Mule drink. When that bar closed, they walked to another bar across the street called Grand Cru, and Jane ordered another drink—some type of shot. When that bar closed, the three friends walked down the block to a place called the Cantina; they secured a table by ordering a bucket of beers. Although none of the three could recall how many beers were in the bucket, they each estimated it was comprised of somewhere between 12 to 18 or 24 regular-sized bottles of beer. Jane could not remember how many beers she consumed at the Cantina, but S.C. thought she likely had more than four.

The three left the Cantina before it closed at 2:00 a.m., and they all walked back to Jane's car—a white sedan. They talked for a while at the car, and then Jane felt like it was time to go home. She did not remember feeling intoxicated, but she believed that she vomited at some point while the men were still talking with her at her car, which J.F. and

3.

S.C. both confirmed in their testimony.  After both men left, Jane decided she wanted to stay in her car for a bit before she tried to drive because she was feeling dizzy, and she had vomited on her boots, so she changed into shoes and put on gray yoga pants.

She proceeded to sit in the driver's seat of her car while using her phone. Suddenly, she heard something loud like someone opening and immediately closing a car door, and she saw defendant sitting in the front passenger seat—a man she did not know and had never seen before.  She told him to get out, but he began demanding that she take him home, threatening to kill her if she did not, and keeping his right hand by his side— she thought perhaps he had a weapon.  She was scared because no one in her family knew where she was:  she was living with her parents and had lied and told them she was going to work.

Jane drove wherever defendant directed; they reached a dark gravel street, like an alley, near what appeared to be an abandoned trailer.  Defendant demanded that she get out of the car and go into the trailer with him, and when she refused, he became angry and aggressive.  Although Jane could not remember the exact sequence of events, defendant pulled out a "bubbly" pipe and began smoking while they were in front of the trailer.  He asked her if she knew what he was smoking and told her it was methamphetamine—he grabbed her face, shoved his tongue in her mouth, and blew smoke into her mouth.  He then started laughing as though it was a joke and said something like "'you just got hooked.'"  Defendant also tried to put his hand up her shirt, although she blocked him; he touched her breast over her clothing.  He kissed her neck and put his hand down her pants toward her genitals, touching skin, which was painful. He tried to get his hand underneath her underwear, and while his finger did not "go completely in" her, it was around the area of her vagina.  He began pulling her hair and demanded that she "suck on his penis," which he had exposed.  He grabbed her neck and forced her face down to his lap. She kept telling him she did not know what to do, and then he pulled on her hair and punched the back of her neck.  Her mouth made contact

4.

with his penis, and she clarified later in her testimony that her mouth was around his penis.

At some point, Jane noticed an oncoming truck and she tried to make a sudden movement to attract the attention of the driver. Defendant hit her and smashed her head into the steering wheel. He put one leg over the console and into the driver's side floor well. She was elbowed in the nose, and he started pulling her hair with so much force she thought her "neck was going to pop" if she did not move toward the passenger seat; they effectively switched places in the car—he pulled her hair and forced her to move to the passenger seat and he moved into the driver's seat.

Jane could not remember what happened next and she floated in and out of consciousness. The next thing she remembered was waking up to a very loud noise and discovering the car was in an orchard and against a tree. Defendant started "freaking out" and blaming her. The OnStar automated system in her car activated, although Jane's subscription was not current. Defendant became angry and, fearing they were going to be located, he broke off the rearview mirror that had an OnStar button, yanking it down and pulling wires with it. Then he started hitting Jane on her neck and face, pulling her hair, and calling her names. After that, she lost consciousness again and woke up to find the car parked at a dairy, where there were a lot of cows—she had no idea where they were.

While in the driver's seat, defendant was speaking Spanish to a man who apparently worked at the dairy. Defendant asked the man why he was not answering his phone and the man told defendant he was working. Jane did not recognize who defendant was talking to, and she did not ask him for any help—she was unsure if he and defendant were "working together." Defendant asked the man for some gas or a gas card, and the man said to wait until "they" leave and pointed to the nearby mobile home.

Defendant then decided to leave the dairy and drove down the street. They made it to the end of the road and the car ran out of gas. Jane saw a woman outside of a house—later identified as I.A.—and Jane told defendant she was going to walk across the

5.

field and ask for gas; he let her get out and Jane ran toward I.A. She told I.A. she had been kidnapped and asked her to call 911. I.A. seemed hesitant to help, so Jane hid behind a clothesline and called 911 from her own phone, which she had been able to get back from defendant during the night after he had grabbed it from her. Another neighbor, L.E., confirmed she saw Jane in a car with a man who was in the driver's seat; the car was stopped on the side of the road. When Jane left the car, the man followed her. L.E. thought it looked like they were "having words" or that something was going on, and L.E. saw the man follow Jane as she ran across the field. When the man approached I.A., she told him to let Jane go with her family, gave him a container to put gas in, and told him to leave. R.B., who was also a neighbor, saw Jane across the street distraught and crying, and he saw a man go to a white car, put a gas can on top of it, and then the man got picked up by someone in a truck.

Jane's 911 call was played for the jury. Jane told the dispatcher she had been kidnapped by a man who had beaten her and threatened to kill her. She said the man was currently standing by her car, described what he was wearing, and that he was leaving in a blue truck with a driver she could not identify. She said she needed an ambulance because her assailant had knocked her out and she had a headache. She told the dispatcher she had "just got off of work" and had gone into Turlock to see some friends, although she admitted at trial that was not true—she told the dispatcher that because she had told her parents she was going to work, and she did not want them to find out she had lied to them. She did not mention anything about a sexual assault to the dispatcher.

A few minutes after Jane called 911, Merced County Sheriff's deputy Ibarra-Perez stopped a blue truck in which defendant was a passenger. The stop was recorded and played for the jury. Defendant had scratches on his head, neck, ear, chest and arms. When Ibarra-Perez asked defendant why he was "all cut up," defendant related a story about a drunk woman he met at a bar the day before. Defendant said he told the woman not to drive, but she insisted on going home, started arguing with him, and she had

6.

"wrecked her car." He said all his scratches were from "just tryin' to fend her off you know." A search of defendant revealed several items including a condom, hand lotion, a pocketknife, and a glass pipe.

After defendant was detained, Ibarra-Perez interviewed Jane. She told the deputy that defendant had entered her car while it was parked in front of the old Dust Bowl; she said she had gotten off work early and was headed home. She explained how defendant threatened to kill her and had beaten her several times during the night while in the car, and that he had grabbed her face and hair, stuck his tongue in her mouth, and blew smoke into her mouth. She also said defendant kept telling her she was beautiful and that he tried to touch her, including putting his hands into her pants.

Ibarra-Perez then went to interview defendant again, which was also recorded and played for the jury. Defendant repeated that he had noticed Jane was intoxicated and vomiting, and then saw her get into her car around 2:00 a.m. He thought she should not drive, so he took the keys from her after she refused not to drive drunk; however, he also asked her for a ride. They got into a physical altercation, and she scratched him, but defendant denied that he punched her, and he did not know how she got the injuries to her face. Defendant admitted smoking methamphetamine in Jane's car.

Jane was transported to Emanuel Medical Center, and the lead investigator, Sergeant Watson, interviewed her there. Jane told Watson she had gone to Turlock to meet with some friends after she decided not to go to work; while she waited for them, she had one drink. When the friends did not show, she started to head home and saw some people she knew and talked to them for a bit in front of her parked car. When those friends left, defendant got into her car. She described that defendant tried to sexually assault her in details that were generally consistent with her trial testimony, but she did not say that his penis touched her lips or went into her mouth—she said he pushed her head toward his exposed penis, which she squeezed defensively and hit him in the side.

She also told Watson that when defendant put his hand down her pants, his fingers penetrated her vagina, but not "fully."

Jane was then taken to a separate medical center for a forensic medical examination. She was examined by a SART (sexual assault response team) nurse, Kiran Gill, who documented multiple bruises, abrasions and redness on Jane's arms, legs, face and upper back; there was redness, bruising, nail marks and scratches on her buttocks and the top of her tailbone; and there was dried blood in her hair, which was tangled. Although Jane noted genital pain, there were no visible injuries to that area, which the nurse explained was not unusual for assault victims. Jane could not recall whether she had vomited that night, but she reported episodes of choking and loss of consciousness while she was with her assailant. She had been punched in the face, elbowed in the nose, her head had been "'slammed'" and her hair "'yanked.'" Jane reported that, when her assailant tried to force her to orally copulate him, Jane had "scratched the assailant['s] face, squeezed [the] assailant's penis, and tried to hit him." He had tried to force her mouth open, but she kept it closed; while her upper lip touched his penis, Jane told the nurse the assailant's penis was never in her mouth. As such, the nurse marked "'attempted'" oral copulation on the examination form. Jane testified she could not remember if she told the SART nurse about the oral copulation, but Jane maintained at trial that defendant's penis was definitely inside her mouth when he forced her head down.

Meanwhile, defendant was interviewed again by Watson at the police station; he did not know Jane's name and he denied assaulting, threatening or kidnapping her. When asked whether he had any sexual contact with Jane, he said there was "some kissing and fooling around." Watson noticed defendant had scratches on his face, neck and chest, and a cut on his finger. A recording of the interview was played for the jury.

Police also searched and photographed Jane's car. Watson testified the vehicle was in a state of disarray. A gas container was found on the front passenger floorboard,

8.

the rearview mirror was removed, and parts were sitting on one of the seats. Parts of the console had been removed and were thrown in the back of the car; floor mats were also thrown in the backseat. There was a noticeable smell of vomit, and Watson noticed vomit near the doors on the passenger and driver sides of the car.

Watson also obtained video footage from the location where Jane's car was originally parked just before the incident, which was played for the jury. It showed a person with the same clothing and of the same stature as defendant getting into the seat of what appeared to be Jane's car parked in front of the Dust Bowl. Watson testified the video showed defendant opening the passenger door, looking in, and walking out of the camera view; then, a few minutes later, defendant reappeared, opened the passenger door and got into the vehicle.

Extracted data from Jane's phone showed text messages with J.F. and S.C. on the evening of March 30, 2018, indicating they were planning to meet in Turlock. Jane's phone showed a call at 10:12 p.m. to S.C. The next data showed a zero-second call to S.C. at 6:24 a.m., and a zero-second call received from an unidentified number at 7:03 a.m. There was an outgoing message sent at 7:58 a.m.; a zero-second call to 911 at 7:58 a.m.; and another instant message was sent at 8:08 a.m. that said to "call 911." The phone made a nine-second call to S.C. at 8:09 a.m.; and an 11.5-minute call to 911 at 8:27 a.m.

Watson also examined J.F.'s phone, which showed a message from Jane's phone at 8:27 a.m. that said "'[c]urrent location'" to which J.F. responded at 8:35 a.m., "'What you send me?'" J.F. sent another text to Jane at 8:49 a.m. asking whether Jane made it home. Jane texted back at 9:41 a.m., "'Don't want you involved. You weren't with me last night.'" J.F. texted at 9:42 a.m., "'What happened?'" Jane did not respond. There was no similar text conversation on Jane's phone, indicating it had been deleted between the time Jane sent that text message to J.F. and when her phone was turned over to police at the hospital.

After reviewing Jane's phone data, Watson interviewed Jane again on April 4, 2018, because her original statement about meeting up with friends who had not shown up was inconsistent with her phone data, which showed she had planned to meet J.F. and S.C.  Further, Jane's statement about only having one drink also seemed incorrect because of the vomit found in her car.  In the follow-up interview, Jane told Watson she did not tell him about planning to meet J.F. and S.C. because of her traditional family— she knew her parents would not approve.  Jane conceded she had more alcohol than she originally indicated:  she had an additional shot at Memo's, then another shot at the Grand Cru; and then possibly two beers at the Cantina.  She had not been forthcoming about how much she drank because of her parents.  She told Watson that defendant had put his hand down her pants, and had gotten his hand inside of her underwear, although "his finger didn't completely go inside," and it felt like a fist.  She confirmed that defendant had exposed his penis around the same time he got angry when she tried to wave her arm at the oncoming driver in the alley by the trailer, but Jane never said her mouth ever touched his penis.  Watson testified the first time he heard Jane allege that defendant's penis had been fully in her mouth was at the preliminary hearing, and a copy of her preliminary hearing testimony was admitted by the defense.  As he did not have information from Jane during the investigation that she had ever had oral contact with defendant's penis, Watson elected not to obtain any DNA samples from defendant's penis.  He also never had custody of Jane's full SART exam report completed by Gill.  The report was two-sided, and only one side was copied.

DNA matching defendant was found on Jane's face and neck, but no male DNA was detected in Jane's vaginal swabs.  Jane's urine and blood samples were collected on March 31, 2018, at 3:52 p.m. and 7:10 p.m., respectively.  Urinalysis results showed the presence of alprazolam, alpha-hydroxy alprazolam and methamphetamine in undetermined amounts.  Alprazolam and alpha-hydroxy alprazolam are both central nervous system depressants that tend to cause drowsiness.  Alprazolam is typically

10.

ingested as prescription medication taken in pill form, and it can cause memory loss. There was no way to determine exactly when or in what amount the methamphetamine was ingested. According to the criminologist, it is possible that one inhalation of methamphetamine could lead to a positive urine result.

The blood results showed hydrocodone and acetaminophen in undetermined concentrations. According to the criminologist, hydrocodone is an opiate, and it slows the body down, including a person's thinking. Acetaminophen is the generic name for Tylenol, and it is not uncommon for hydrocodone to be prescribed in a mixture of both hydrocodone and acetaminophen. The hydrocodone detected in Jane's blood was minimal and there was no way to determine when or how much she had ingested. Jane testified she took over-the-counter medication for headaches, and she used an inhaler for respiratory issues; she had been prescribed hydrocodone when she broke her leg in 2016, but she did not think she had had any on the date of the incident. She denied any other medication or drug use.

The parties stipulated that Jane's blood-alcohol percentage (BAC) was zero at the time of testing. A criminologist testified it was impossible to perform a retrograde analysis on levels of BAC unless it is known when exactly the subject "hit zero" percent BAC. Assuming someone of Jane's weight had six standard drinks between 10:00 p.m. and 2:00 a.m., that person's BAC would be expected to be around 0.08 percent at 2:00 a.m. If this hypothetical person had an additional standard drink between midnight and 2:00 a.m., her BAC would be expected to be about 0.10 or 0.108 percent at 2:00 a.m., and about zero percent at 8:00 a.m.

## II.    The Defense Case

A nurse, Lauren Marson, who attended Jane at Emanuel Medical Center around 11:20 a.m. on March 31, 2018, testified Jane told her she had been sexually assaulted after the assailant had entered her car; Jane told Marson she felt perhaps drugs had been involved. She said the assailant punched her in the face, her hair was pulled, and her

11.

head was slammed into parts of the vehicle. She also reported the assailant asked her to do drugs out of a pipe, forced his mouth onto hers, and threatened her multiple times. Jane did not mention any oral copulation or digital penetration. Jane was then sent to Memorial Medical Center, where a SART team would take over for evidence collection.

Jose, I.A.'s son, testified that he worked on a dairy near his parents' house where he saw defendant around 7:00 or 8:00 a.m. on March 31, 2018. He had started work when defendant came to the dairy driving Jane's car. He wanted money for gas, but Jose did not have any. The woman with defendant got out of the car and started taking pictures or videos of the cows. Then she got in the driver's seat, defendant got in the passenger seat, and they left together.

Dr. Howsepian, an expert in forensic psychiatry and psychopharmacology, testified about how alcohol, alprazolam, and hydrocodone each can cause memory impairment. Together, these substances can have a synergistic effect. He testified that people with memory impairments are more prone to confabulation—filling in memory gaps with information from other sources that may or may not be true. Leading questions during interviews could be a source of information from which a person may confabulate memories that they may sincerely believe to be true. Given hypothetical circumstances similar to this case, Dr. Howsepian opined a person in Jane's position would be at risk of confabulating.

## III.    Verdict and Sentencing

The jury deadlocked on count I, forcible oral copulation, and a mistrial was declared as to that count. The jury returned a guilty verdict on all other counts. Defendant was sentenced to a determinate term of seven years eight months, followed by an indeterminate term of life with the possibility of parole.

12.

## DISCUSSION

### I. Late Discovery of Gill's Complete SART Report

Gill's examination report was not copied correctly by the prosecution team and, as a result, only the even-numbered pages of Gill's report were disclosed to the defense prior to trial. The mistake was discovered during Gill's cross-examination, and a full copy of the report was obtained and disclosed to the defense before Gill's cross-examination resumed. The trial court declined, based on this untimely disclosure, to grant defendant's request for a mistrial. Defendant argues that because the untimely disclosure constituted a prejudicial violation of federal and state law and rendered his trial fundamentally unfair, the trial court's refusal to grant a mistrial was an abuse of discretion.

#### A. Additional Background

During her direct examination, Gill testified Jane had reported that while she had been in the car with her assailant, she had fought him off by scratching his face, squeezing his penis and trying to hit him. On cross-examination, defense counsel asked Gill what, if anything, Jane had told her about her assailant digitally penetrating her. Gill indicated she did not have that page of her report with her, but she could answer the question if she had it. It was then that defense counsel discovered this page of the report, including all odd-numbered pages, had not been disclosed during discovery—and neither the prosecutor, Gill, nor Watson had a complete copy with them in the courtroom. The cross-examination was postponed while a complete copy of the report was obtained.

When the full report was obtained over the lunch hour, it was marked "Court's Exhibit No. 1" in proceedings occurring outside the presence of the jury. There were two statements on page 3 of Gill's report of particular relevance to the charges of forcible oral copulation, kidnapping and assault. The nurse had recorded that the "[v]ictim felt like a fist penetrating her vagina and says she felt and [saw] his finger insert [into] her vagina";

13.

and that the "[a]ssailant grabbed victim's face close to his genitals and forced her to open [her] mouth but she kept mouth closed. She felt her upper lip touching his penis."

Defense counsel requested that reference to the previously undisclosed statements, particularly on page 3 of the report, be excluded. Defense counsel also requested a mistrial, asserting defendant's right to effective assistance of counsel was violated and his ability to effectively cross-examine witnesses was thwarted. Further, defense counsel argued that if the information had been disclosed timely, counsel would have been able to craft a better trial strategy, including anticipating questions and testimony—counsel asserted the late disclosure "effectively changed [the] defense mid trial." Counsel noted that in opening statements he had not mentioned anything about what Jane told Gill, which he argued the jury would notice.

The trial court concluded the statements in the report were "pretty much" the same as testimony already given. The trial court pointed out Jane was still subject to recall, and defense counsel could question her about the statements she made to Gill: "Basically it's the same statements that were given pretty much before. I don't see that there's much of anything different. The last course of action that the Court is supposed to resort to is to exclude evidence. I'm not going to do that here. [¶] I see you—certainly this wasn't done on purpose. It's quite obvious that when the discovery was copied it was copied just every other page. And both sides could have noticed that. But I don't see that there's really anything new or different here." The trial court then offered to give an admonition to the jury about the late discovery, but did not exclude the evidence and denied the request for a mistrial.

Defense counsel then objected on due process grounds and contended defendant was entitled to question the investigators on the quality of the investigation. The court pointed out that Watson was still available. The court observed again that if the defense wished to recall Jane, she was still subject to recall and could be cross-examined further; the trial court reiterated it was denying counsel's requests.

14.

The trial resumed, and defense counsel then elicited testimony from Gill about what Jane told her regarding the oral copulation, including that defendant had forced Jane's mouth open, her lip touched his penis, but his penis never got past her lips. Neither defense counsel nor the prosecutor elicited any testimony from Gill about Jane's statement, recorded in Gill's report, that it felt like a fist penetrating her vagina and that Jane saw and felt her assailant insert his fingers into her vagina. Further, the report itself was not admitted as evidence.

The following day, after the parties discussed a late-discovery jury instruction off the record, the prosecutor objected to the defense's proposed instruction. The prosecutor indicated that if the court was inclined to give the instruction, then the People would seek to admit the report through Watson so the jury could consider exactly what was not timely disclosed so it had a context for the instruction. Defense argued that admitting the full report was more prejudicial than probative under Evidence Code section 352. The trial court agreed with the defense, correctly noting Gill had not testified to every single detail in the report and, thus, the report itself was not to be admitted. The court ruled the prosecutor could question Watson about how the report copies were made and how the late disclosure occurred. The court reiterated that it found the untimely disclosure to be negligent rather than purposeful, and the jury was intelligent and could "figure it out whether they think there was anything there that was that important that wasn't disclosed."

Watson subsequently testified about the late disclosure of the complete report and how copies of it were obtained. After the close of evidence, the trial court instructed the jury as follows: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose [the]

full SART report within the legal time period.  [¶]  In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

During deliberations, the jury requested the body diagram from Gill's report showing injury areas on Jane's body (which had been timely disclosed and was used during Gill's cross-examination); and a readback of the trial testimony of Jane, nurse Marson, and nurse Gill.  The jury was unable to reach any verdict on the forcible oral copulation charge, and a mistrial was declared as to that count; the charge was later dismissed by the prosecution.

### B.    The Parties' Arguments

In the untimely disclosed portion of Gill's report, defendant focuses on two statements Jane made to Gill relevant to her allegations of digital penetration and oral copulation.  These statements were inconsistent with Jane's trial testimony and other prior statements and, thus, they were helpful to the defense theory that Jane was not a reliable and credible witness.  However, defendant claims the defense was unable to make effective strategic use of these impeaching statements given their untimely disclosure.  The statements were not disclosed until after Jane had testified, and defendant claims he was unable to cross-examine her effectively; Gill's report was not acknowledged by defense counsel in opening statements, and this undercut the defense team's credibility with the jury; and the late disclosure forced defense counsel to change strategy mid-trial—had the report been timely disclosed, defense counsel would have been better prepared to ask different questions of Jane and Gill, make different objections, and/or anticipate prosecution questions more effectively.

According to defendant, the effects of the delayed disclosure rendered defendant's trial fundamentally unfair in violation of his federal constitutional right to due process and constituted an incurable *Brady* error, a prejudicial discovery violation under section 1054.1, and it amounted to prejudicially ineffective assistance of counsel under the federal Constitution's Sixth Amendment.  Moreover, due to the prejudice caused by

16.

the delayed disclosure of Gill's complete report, defendant contends the only adequate remedy was to grant his request for a mistrial, which the trial court failed to do.

The People concede the untimely disclosure was a discovery violation under section 1054.1, but dispute that it was prejudicial. They also maintain the delayed disclosure did not constitute a *Brady* violation because the report was disclosed at trial and was not technically suppressed. The People also maintain the untimely disclosed pages of Gill's report were not material within the meaning of *Brady*. Specifically, the delayed disclosure made no difference in the defense theory of the case—what the defense asserted at closing argument was not different from the theory of the case defense presented in opening statements. Moreover, the People argue, defendant was able to cross-examine both Jane and Gill because the complete report was disclosed before Gill's cross-examination was completed and while Jane was still subject to recall. The People point out the trial court gave a curative jury instruction, which effectively informed the jury that defense counsel's failure in opening arguments to mention what Jane told Gill was unintentional. According to the People, nothing about the delayed disclosure caused incurable prejudice to defendant, and the trial court's refusal to grant a mistrial was not an abuse of discretion.

## C.     Standard of Review

The denial of a motion for mistrial is generally reviewed for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ""a [defendant's] chances of receiving a fair trial have been irreparably damaged.""" (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

17.

"A motion for mistrial presupposes error plus incurable prejudice. '"The burden is on the accused to establish prejudice where there has been a lack of timely discovery, and in the absence of prejudice the judgment must be affirmed." [Citation.]'" (*People v. Gatlin* (1989) 209 Cal.App.3d 31, 38.) "It is axiomatic that the prejudicial effect of errors may be overcome by subsequent corrective action such as the admonishment of the jury and that in such event the error may be deemed cured." (*People v. Ryan* (1981) 116 Cal.App.3d 168, 184, abrogated on another ground in *Missouri v. McNeely* (2013) 569 U.S. 141, 156.)

### D.  Analysis

#### 1.  No *Brady* Error

Defendant argues the untimely disclosure constituted a *Brady* violation that necessitated a new trial.

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra*, 373 U.S. at p. 87) "'Pursuant to *Brady*, *supra,* 373 U.S. 83, the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request (*id.* at p. 87 …), a general request, or none at all .…' (*In re Brown* (1998) 17 Cal.4th 873, 879.) 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies.'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279.) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian* (1995) 9 Cal.4th 535, 544; accord, *People v. Salazar* (2005) 35 Cal.4th 1031, 1050 (*Salazar*); *Kyles v. Whitley* (1995) 514 U.S. 419,

435.)  "'Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review.'"  (*People v. Verdugo, supra*, at p. 279.)

Thus, stated succinctly, there are three components of a true *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  (*Salazar, supra*, 35 Cal.4th at p. 1043.)  In this context, the prejudice inquiry focuses on the materiality of the evidence to the issues of guilt and innocence.  (*Ibid*.)  Materiality requires more than a showing the suppressed evidence would have been admissible, that its absence made conviction more likely, or that using it to discredit a witness's testimony might have changed the outcome of the trial. (*Ibid*.)  Rather, the defendant must show a reasonable probability of a different result.  (*Ibid*.)  On appeal, the defendant bears the burden to establish the components of a *Brady* violation.  (*Strickler v. Greene* (1999) 527 U.S. 263, 280–282.)

### a)  Report Contained Favorable Evidence to Defense

There is no dispute the missing pages of Gill's report had impeachment value with respect to Jane:  it contained statements by Jane that were inconsistent with other statements she made about whether and how the oral copulation occurred and whether she saw defendant's digital penetration of her vagina.  Thus, this was favorable evidence within the meaning of *Brady*.  (*People v. Williams* (2013) 58 Cal.4th 197, 256 [evidence is favorable under *Brady* if it helps the defense such as by impeaching a witness].)

### b)  Whether Report Was Suppressed

As for the second *Brady* element, the People argue the report was not actually suppressed within the meaning of *Brady* because it was disclosed at trial.  Defendant cites *People v. Mora and Rangel* (2018) 5 Cal.5th 442 (*Mora and Rangel*) and argues that in cases of delayed disclosure rather than total nondisclosure, the applicable test under

19.

*Brady* is whether defense counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.

In *Mora and Rangel*, the prosecution failed to disclose a number of documents until trial. The high court unambiguously held that "[e]vidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery." (*Mora and Rangel, supra*, 5 Cal.5th at p. 467, citing *People v. Verdugo, supra*, 50 Cal.4th at p. 281 & *People v. Morrison* (2004) 34 Cal.4th 698, 715.) The high court then cited two federal appellate decisions that analyzed *Brady* claims involving delayed disclosure rather than total nondisclosure. (*Mora and Rangel, supra*, at p. 467.) Those courts considered whether the delay prevented defense counsel from using the disclosed evidence effectively in preparing and presenting the defendant's case and concluded no *Brady* violation had occurred. (*Mora and Rangel, supra*, at p. 467, citing *United States v. Devin* (1st Cir. 1990) 918 F.2d 280, 289 (*Devin*) & *United States v. Scarborough* (10th Cir. 1997) 128 F.3d 1373, 1376 (*Scarborough*).) The court then concluded, like *Devin* and *Scarborough*, that no prejudice arose from the late disclosure. (*Mora and Rangel, supra*, at p. 467.)

Just as in *Mora and Rangel*, this case involves an untimely disclosure at trial, which is not considered suppression for *Brady* purposes. Nevertheless, to satisfy due process, an untimely disclosure must not be too late for the defendant to make use of any of its benefits. (*United States v. Warhop* (10th Cir. 1984) 732 F.2d 775, 777; *United States v. Davenport* (9th Cir. 1985) 753 F.2d 1460, 1462 ["Disclosure, to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the accused."].) Thus, untimely disclosure at trial might be considered suppressed within the meaning of *Brady* if the delay caused prejudice. (*United States v. Burke* (10th Cir. 2009) 571 F.3d 1048, 1055–1056 [observing majority of federal Courts of Appeals have held that while untimely disclosure of *Brady* material does not constitute a constitutional violation in itself, it may violate due process if the defendant can show he was prejudiced

by the delay].)  Ultimately, this second element regarding suppression turns on the prejudicial effect of a delayed disclosure, which is encompassed under *Brady*'s third element.  For the reasons explained *post*, the report was neither suppressed nor material because the untimely disclosure did not prejudice defendant's ability to effectively use the evidence or prepare his case.

### c)  Materiality and Prejudice

As noted, the third element under *Brady* considers the materiality of the nondisclosed evidence, which incorporates an analysis of prejudice.  (See *Salazar, supra*, 35 Cal.4th at p. 1050; see also *People v. Verdugo, supra,* 50 Cal.4th at p. 279 [evidence is material under *Brady* if there is a reasonable probability its disclosure would have altered the trial result].)  In delayed disclosure cases, to demonstrate materiality and, thus, prejudice necessary to establish a *Brady* violation, a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence, and specifically how, had the evidence been disclosed earlier, a reasonable probability exists that the result of the defendant's trial would have been different.  (*McNeill v. Bagley* (6th Cir. 2021) 10 F.4th 588, 600–601; *United States v. Blackwell* (6th Cir. 2006) 459 F.3d 739, 759.)

Similar to *Mora and Rangel*, *Devin* and *Scarborough,* defendant is unable to demonstrate to a reasonable probability that earlier disclosure would have created more doubt about his guilt or affected the result of the trial.  (*Scarborough, supra*, 128 F.3d at p. 1376 [the appellant did not show earlier disclosure would have created any greater doubt about the appellant's guilt or affected the result of the trial]; *Devin, supra*, 918 F.2d at pp. 290–291 [the defendant unable to show that a more effective strategy would likely have resulted upon timely disclosure]; *Mora and Rangel, supra*, 5 Cal.5th at p. 467 [delayed disclosure of fingerprints report did not result in prejudice to the defendants].)

Defendant argues the delayed disclosure forced his trial counsel to alter the defense strategy mid-trial.  We are unable to detect any change in strategy after Gill's

21.

complete report was disclosed to the defense, nor does defendant articulate an alternative theory he was unable to pursue. The defense theory presented to the jury in opening statements was that Jane was not a reliable or credible witness, in part because she made inconsistent statements about what occurred, and this was also the central feature of the defense closing arguments. Jane's statement to Gill that defendant's penis touched her lips, although inculpatory in the sense it supported the forcible oral copulation charge, dovetailed perfectly into defense's opening remarks that Jane had made so many different statements and omissions about the oral copulation, counsel had no idea what Jane was going to say at trial. Jane's statement to Gill introduced yet *another* statement that, while consistent with Jane's statements to Watson that defendant forced her head down toward his penis, was inconsistent with Jane's trial and preliminary hearing testimony that defendant's penis was in her mouth. Indeed, in closing argument, defense counsel made effective use of this inconsistency, which complimented counsel's initial presentation to the jury in opening statements.

The other statement Jane made to Gill, which defendant highlights in his arguments—i.e., she felt and saw her assailant's fingers penetrating her vagina—never reached the jury: neither the prosecution nor the defense asked Gill any questions about this statement. Beyond the fact that this statement never got to the jury, there is no indication the discovery of this statement changed anything about the strategy that the defense was pursuing before the disclosure, or that it opened the door to a different strategy that the defense had no adequate time to pursue. (*Devin, supra*, 918 F.2d at p. 290 [analyzing the effect of delayed disclosure includes whether it altered subsequent defense strategy and whether a more effective strategy would have likely resulted with timely disclosure].)

Defendant asserts the untimely disclosure precluded him from effectively cross-examining prosecution witnesses, but his assertions lack any specificity about what would have been different or how it would have affected the result. (*Devin, supra*, 918

22.

F.2d at p. 290 ["A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory allegations but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed."].)  Defendant notes Jane had already testified when the completed report was disclosed, but Jane was subject to recall and defendant elected not to recall her.  Defendant maintains recalling Jane would have only further emphasized the inculpatory aspects of her statements to Gill, but this argument underscores that the defense had little to gain by cross-examining Jane on these inconsistencies.  Jane had already made other inconsistent statements about whether oral copulation had occurred, and she could not remember what she had told Gill about the oral copulation or the digital penetration when defense counsel asked her.  Once Gill testified about Jane's statement regarding the oral copulation, defendant was able to make full use of the impeaching aspects of it in closing argument without confronting Jane about it and emphasizing its inculpatory aspect.  Defendant generally claims the opportunity to recall Jane was insufficient because he would have elected to cross-examine her differently with earlier disclosure of Gill's report.  However, he points to nothing specific about Jane's original cross-examination that would have changed with timely disclosure of Gill's report or how there was a reasonable probability any such change in approach would have affected the outcome.

As for Gill, she was still undergoing cross-examination when defense counsel obtained the complete report, and the defense had a full opportunity to question her about what Jane told her.  Defendant argues generally that if trial counsel had had the complete report timely, he would have been able to shape different questions and better anticipate the prosecution's questions.  This assertion is far too conclusory to demonstrate any effect on the cross-examination:  defendant does not identify any particular objection that he could have made but did not, or any question he would have asked but lacked the opportunity to do so.

23.

Defendant contends the delayed disclosure undercut the defense team's credibility with the jury because counsel did not inform the jury what Jane told Gill in opening statements. Yet, defendant does not demonstrate how the jury instruction regarding the late disclosure was insufficient to cure this issue as it effectively told the jury that defense counsel had not deliberately failed to mention Jane's statements to Gill.

There is simply no reasonable probability that, had Gill's complete report been disclosed timely, the outcome would have been different. Defendant makes no showing what questions would have been asked or objected to had there been more time to prepare. While Jane's credibility was one of the key elements of the prosecutor's case, Jane's inconsistent statement to Gill about the oral copulation was presented to the jury, and defendant was able to make full use of its impeachment value in closing arguments. Nor has defendant shown how the untimely disclosure caused a mid-trial strategy shift or what alternative strategy he would have pursued with timely disclosure. While defendant generally argues he would have done things differently, particularly in regard to questions and objections, he does not indicate with any specificity what changes would have been made or demonstrate how it would have made a difference to any degree of reasonable probability. (See *Giglio v. United States* (1972) 405 U.S. 150, 766 [new trial not required under *Brady* where newly discovered evidence possibly useful to the defense but not likely to have changed the verdict].)

While Jane's statements to Gill were favorable evidence for the defense based on their impeachment value, neither the suppression nor the materiality elements of *Brady* are satisfied here. The trial court did not abuse its discretion in failing to grant a mistrial due to a *Brady* error.[3]

---

[3] Although defendant presents a more general fundamental fairness due process argument in addition to his claim of *Brady* error, the "whole foundation for *Brady* … is due process and its requirement that an accused be afforded a fair trial." (*People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 50, fn. 11.) The two analyses overlap in all meaningful respects. For all the same reasons the untimely disclosed report was not material evidence for purposes of *Brady*, the

## 2. Other Errors Arising From Late Disclosure Were Not Prejudicial

State law also contains independent discovery obligations, which defendant argues were prejudicially violated by the late disclosure. Section 1054.1 requires the prosecution to disclose to the defense "[a]ll relevant real evidence seized or obtained as part of the investigation of the offenses charged" and "[a]ny exculpatory evidence." (*Id.,* subds. (c), (e).) It also obligates the prosecutor to disclose written reports of the statements of witnesses the prosecutor intends to call at trial, including expert reports. (*Id.,* subd. (f).) Under section 1054.7, "'[a]bsent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.'" (*People v. Verdugo, supra*, 50 Cal.4th at p. 280.) "To prevail on a claim alleging violation of discovery statutes, an appellant must show there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different." (*Mora and Rangel, supra*, 5 Cal.5th at p. 467; see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13 [violation of § 1054.1 is prejudicial only when reasonably probable, by state law standards, that omission affected trial result], disapproved on a different ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

The People concede the untimely disclosure was a violation of state discovery laws—Gill's complete report should have been disclosed at least 30 days before trial. (§§ 1054.1, subd. (f) [prosecutor shall disclose relevant witnesses' written statements or reports of witnesses' statements who the prosecutor intends to call, including reports and statements of experts], 1054.7 [required disclosures shall be made at least 30 days prior to the trial except for good cause shown].) However, for all the reasons already considered regarding defendant's *Brady* claim, defendant has not demonstrated there is a reasonable

---

late disclosure did not preclude defendant from receiving a fundamentally fair trial, including the opportunity to present a complete defense.

probability that, had the evidence been disclosed timely, the result of the proceedings would have been different. (*Mora and Rangel, supra*, 5 Cal.5th at p. 467 [to show prejudice arising from violation of discovery statute, the defendant must show there is a reasonable probability that, but for the state law discovery violation, the defendant would have achieved a more favorable result].)

As already discussed, there is no indication the untimely disclosure forced defendant to pursue a different defense strategy mid-trial. The inconsistencies in Jane's statements to Gill fully supported defendant's existing defense that Jane was an unreliable and untrustworthy witnesses, and nothing in defendant's closing argument evidenced the adoption of a new defense theory, nor does defendant articulate a different theory he could have pursued had the report been timely disclosed. Defendant was able to cross-examine Gill regarding the complete report, and the defense had the ability to recall Jane. Defendant points to no questions or objections defense counsel could have asked or interposed had Gill's complete report been disclosed timely.

Defendant cites and relies on *People v. Hughes* (2020) 50 Cal.App.5th 257, where the Court of Appeal concluded that only a mistrial could cure the prejudicial admission of an expert opinion and diagrams disclosed for the first time during trial. (*Id.* at pp. 260–261.) The untimely disclosure in *Hughes* involved highly technical expert testimony based on mathematical calculations formulated in advance of trial that was very favorable to the prosecution. (*Id.* at pp. 270–271, 278.) The defendant had no adequate opportunity to review or rebut the newly disclosed evidence. (*Id.* at p. 280.) Moreover, the testimony related to the critical and disputed issue in the case without which it was "unlikely in the extreme" the prosecution would have been able to prove its case. (*Id.* at p. 284). Here, unlike *Hughes*, the untimely disclosed statements in Gill's report were minimal and revealed two things Jane told Gill during the exam. These recorded statements did not constitute an expert's analysis of complex scientific or mathematical data that would require extensive consideration by counsel or another expert to

26.

effectively rebut.  Nor were the undisclosed statements in the report the most compelling piece of evidence supporting the heart of the prosecution's case, as was the situation in *Hughes*.  Defendant maintains Jane's credibility was key to the prosecution's case, but Jane had already made other inconsistent statements about the oral copulation such that the impeachment value of the statement she made to Gill was fairly minimal.  Most importantly, defendant does not explain beyond general assertions how he could have more effectively used her statements to Gill to discredit Jane in a way that would have likely affected the outcome, or how specifically he could have better ameliorated the inculpatory aspects of those statements, had the disclosure of Gill's report been made timely.

Defendant also claims his counsel was ineffective for failing to discover the incomplete report before trial, but this claim fails for all the reasons already discussed.  To be constitutionally ineffective, counsel's performance must fall below prevailing professional norms and there must be a reasonable probability shown that, but for counsel's failings, the result would have been more favorable to defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; accord, *People v. Mitcham* (1992) 1 Cal.4th 1027, 1057–1058.)  Assuming defense counsel's performance was deficient, defendant has not demonstrated a reasonable probability the result would have been more favorable had the disclosure error been discovered by defense counsel earlier.

The trial court did not abuse its discretion in refusing to grant a mistrial based on state law discovery errors or based on ineffective assistance of counsel as defendant has failed to establish either had a prejudicial effect on the outcome.

### 3. No Confrontation Clause Violation

Defendant also summarily claims the untimely disclosure of Gill's complete report precluded him from cross-examining witnesses in violation of defendant's federal constitutional right under the Sixth Amendment.  Jane, however, was still subject to recall when the disclosure of Gill's report was made, and defendant was free to recall and cross-

27.

examine her about the statements she made to Gill. Moreover, defendant cross-examined Gill after the disclosure was made. In such a circumstance, there is no Sixth Amendment confrontation clause violation. (*People v. Cowan* (2010) 50 Cal.4th 401, 463.)

### 4. Denial of Mistrial Was Not An Abuse of Discretion

Defendant has failed to show any prejudicial federal or state law error arising out of the untimely disclosure of Gill's complete report. While defendant maintains the overall fairness of the trial was fundamentally affected by the untimely disclosure and caused incurable prejudice, we see no indication of that. The impeachment value of Jane's inconsistent statements to Gill was not profound, nor does defendant explain how those statements would have fundamentally changed his cross-examination of Jane or altered his trial strategy or preparation in a way that could have affected the outcome had he known about them sooner.

Jane's credibility was a key aspect of the prosecution's case as no one else witnessed exactly what happened while defendant was in Jane's car, but the two additional inconsistencies revealed in Gill's report—one of which was not even presented to the jury after disclosure—did little to diminish Jane's overall credibility in claiming defendant threatened, kidnapped and assaulted her. This was not an identity case. There was ample evidence defendant, a total stranger to Jane, got into Jane's car around 2:00 a.m. after he saw her vomiting and sitting in her car alone: he admitted it to police; his entry into Jane's vehicle was captured on a video recording; and moments after Jane's 911 call around 8:30 a.m., law enforcement stopped defendant while traveling in a blue truck that multiple witnesses had seen him get into after Jane's car ran out of gas.

Moreover, Jane always consistently maintained defendant threatened her and forced her to drive to a dark alleyway, where he forcibly touched her sexually and beat her, fought with her to pull her into the passenger seat, and then drove the car until it ran out of gas. Jane did not tell the 911 dispatcher that she was sexually attacked, but the dispatcher never asked. Jane told Ibarra-Perez that her assailant placed his hands

28.

underneath her pants, although she did not mention anything about forced oral copulation. Nevertheless, Jane told everyone else she talked to that day that she was sexually assaulted—i.e., nurse Marson, nurse Gill and Watson—even if the exact details were not entirely consistent. Indeed, that is why Jane was sent to Gill for a sexual assault examination.

There was also considerable circumstantial evidence that none of what occurred after defendant got into Jane's car was consensual: when law enforcement found Jane, she had redness on her face; on medical examination that day, she had bruises, abrasions, and redness on her head, ears, back, arms and legs; there were indentation marks like that from fingernails on her legs; there was dried blood in her tangled hair. Jane's car was found in a state of disarray—the rearview mirror was ripped down, the console was damaged, clothing and items were strewn all over the interior. When Jane got away from defendant, she immediately sought help, called 911 and reported that she had been kidnapped and beaten. Witnesses and law enforcement noted her demeanor was frightened and upset when she reported to them that defendant had kidnapped and beaten her.

Moreover, defendant made several damaging statements during police questioning. Defendant admitted to law enforcement that he got into Jane's car, but he did not know Jane at all, and that when she refused his entreaty that she not drive drunk, he nonetheless asked her for a ride; he admitted he got "high" in Jane's car, but somehow ended up driving the car himself—indeed, he was seen in the driver's seat by multiple witnesses, including at the dairy and where the car ran out of gas; he acknowledged to Watson that, despite Jane being a complete stranger, there was a sexual component to their encounter—he said they had kissed and "fooled around," although he denied he put his hands down her pants. Defendant's version of events that he had just been acting as a Good Samaritan when he got into Jane's car was implausible and illogical. While the jury deadlocked on the forcible oral copulation count, which required the prosecution to

29.

prove that Jane's mouth actually came into contact with defendant's penis, there is no reasonable probability that, with timely disclosure of Jane's two inconsistent statements to Gill, the case could have been presented so differently as to result in a more favorable outcome for defendant. (§ 287, subd. (a); CALCRIM No. 1015 ["**Oral copulation** is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required."].)

As already noted, while potential prejudice stemmed from defense counsel's inability to address in opening statements what Jane told Gill, this was fully mitigated by the trial court's curative jury instruction regarding the untimely disclosure. Based on the instruction, the jury knew defense counsel's omission was unintentional.

Defendant also argues the trial court's refusal to grant a mistrial was based on an incorrect understanding of the facts because the court noted Jane's statements to Gill were "pretty much" the same as testimony already given, although with "[a] little bit different detail." Defendant contends the trial court misunderstood that Jane's statements to Gill contained critical inconsistencies with other statements Jane had made, including her trial testimony.

"'"'To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision." [Citation.]'" (*In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200.) We disagree the trial court had a fundamental misunderstanding of the facts underlying the motion for a mistrial. The trial court's observation about the similarity of Jane's statements was made in response to defense counsel's argument that Jane's statements to Gill were "totally new" and "more detailed than anything else that we have" such that defense counsel argued he was being forced to change, mid-trial, the entire defense. In context, the trial court was pointing out that Jane's statements to Gill, while inconsistent as to some of the details regarding the oral copulation and what she saw with regard to the digital penetration, were consistent with

30.

Jane's trial testimony that defendant had forced Jane to orally copulate him and that he had digitally penetrated her vagina to some degree. The trial court's statements do not reflect a fundamental misunderstanding of the facts underlying defendant's motion for a mistrial.

In sum, defendant has not demonstrated an incurable error stemming from the delayed disclosure of Gill's report that only a mistrial could cure, and the trial court did not err in refusing to grant a mistrial. (*People v. Collins, supra*, 49 Cal.4th at pp. 198–199.)

## II. Sentencing the Upper Term Under Section 1170

Defendant argues the trial court erred by imposing an upper term sentence on count IV under section 1170, subdivision (b) (section 1170(b) or § 1170(b)).

### A. Background

Effective January 1, 2022, section 1170(b)(1) provides that "the court, shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." Under section 1170(b)(2), the statute permits a court to "impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.…" Notwithstanding section 1170(b)(1) or (b)(2), "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury.…" (§ 1170(b)(3).)

Defendant was sentenced on March 7, 2022, after this version of section 1170(b) went into effect. The trial court specifically asked the parties to be prepared to discuss

31.

the changes to section 1170(b) at the sentencing hearing.[4] The trial court imposed the upper term on count IV, assault with the intent to commit sexual penetration based on the following aggravating circumstances: (1) numerous felony and misdemeanor convictions increasing in seriousness (Cal. Rules of Court, rule 4.421(b)(2)); (2) defendant has served a prior term in prison or county jail under section 1170, subdivision (h) (Cal. Rules of Court, rule 4.421(b)(3)); and (3) defendant's prior performance on supervision was unsatisfactory (*id.,* rule 4.421(b)(5)).

Defendant argues that none of the aggravating circumstances relied on by the trial court to impose the upper term were admitted by him, found true beyond a reasonable doubt by a jury, or proven by a certified record of conviction under section 1170(b)(2) or (b)(3). Instead, the trial court relied solely on the probation report, which is not a certified record. Defendant maintains that without any certified records of conviction as required under section 1170(b)(3), the prerequisites necessary for the trial court to impose an upper term were missing and the sentence is unauthorized. Alternatively, defendant argues, the record is insufficient to support any findings or conclusions about defendant's prior conviction history, and the lack of this necessary evidence cannot be deemed nonprejudicial under any formulation of the harmless error test. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1115, fn. 6 (*Zabelle*).)

The People concede imposition of the upper term was erroneous under state law because none of the facts underlying the aggravating circumstances were proven or established according to section 1170(b)(2) or (b)(3). Further, the People agree with defendant's alternative assertion that this error cannot be deemed harmless because such

---

**4** This case does not involve retroactive application of amended section 1170(b), because the amended statute was in effect at the time of sentencing. Thus, unlike cases involving retroactive application of amended section 1170(b), there is no question whether the discretion exercised was informed.

an assessment would require making speculative assumptions about the existence of extra-record materials related to defendant's criminal history.

## B. Analysis

"[A]n unauthorized sentence or one in excess of jurisdiction is a sentence that 'could not lawfully be imposed under any circumstance in the particular case.'" (*In re G.C.* (2020) 8 Cal.5th 1119, 1130, quoting *People v. Scott* (1994) 9 Cal.4th 331, 354 (*Scott*).) "An unauthorized sentence is just that. It is not subject to a harmless error analysis. Nor does it ripen into a sentence authorized by law with the passage of time." (*In re Birdwell* (1996) 50 Cal.App.4th 926, 930.) "This is not merely a matter of labeling. Determining whether an error is harmless requires analysis of the facts and circumstances of the case, and presumes that there are circumstances under which the erroneous sentence can be imposed. Such qualities are antithetical with an unauthorized sentence." (*People v. Cabrera* (2018) 21 Cal.App.5th 470, 478; see *People v. Soto* (2016) 245 Cal.App.4th 1219, 1235 [restitution fine imposed in violation of § 654 deemed an unauthorized sentence not subject to harmless error analysis].)

However, not all sentencing errors constitute unauthorized sentences. (*In re G.C., supra*, 8 Cal.5th at pp. 1130–1131.) Sentences that are otherwise permitted by law but are imposed in a procedurally or factually flawed manner are not unauthorized. (*Scott, supra*, 9 Cal.4th at p. 354.) In other words, there is a "distinction between a sentencing decision that the trial court had the discretion to make, although flawed in some way, and one for which it had no legal authority." (*People v. Roth* (2017) 17 Cal.App.5th 694, 704–705.) Thus, a court's failure to properly articulate its discretionary sentencing choices, for example, does not constitute an unauthorized sentence; rather, it is a forfeitable legal error. (*Scott, supra*, at p. 353; *In re G.C., supra*, at p. 1130 [failure to properly designate offense a felony or misdemeanor under § 702 is not an omission that causes the sentence to be unauthorized]; *People v. Neal* (1993) 19 Cal.App.4th 1114, 1117, 1121 [failure to articulate required reasons for imposing a consecutive sentence

does not create an unauthorized sentence]; *People v. Tillman* (2000) 22 Cal.4th 300, 303 [failure to give reasons for not imposing restitution fine did not amount to unauthorized sentence].)

Under former subdivision (b) of section 1170, when a judgment of imprisonment was to be imposed and the statute specified three possible terms, the choice of the appropriate term rested within the sound discretion of the sentencing court to select the term that "best serves the interests of justice." (§ 1170, former subd. (b).) As the court had the authority to select any term of imprisonment in the exercise of its discretion, purported error in doing so did not amount to an unauthorized sentence—it was treated as a forfeitable legal error based on a flawed or erroneous exercise of the trial court's lawful discretionary choice and a harmless error analysis was applied. (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 492 ["When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper."].)

Under newly amended section 1170(b)(1), however, the sentencing court is now expressly precluded from imposing an upper term sentence unless specific prerequisites are met: (1) the existence of aggravating circumstances the trial court concludes justify imposition of a sentence exceeding the middle term; and (2) the facts underlying each of these circumstances are admitted by defendant, or have been found true beyond a reasonable doubt by a jury or a judge in a court trial. (*Id.,* subd. (b)(2).) Notwithstanding section 1170(b)(1) and (b)(2), the trial court may also consider defendant's prior convictions based on certified records. (*Id.,* subd. (b)(3).) If there are no aggravating circumstances proven or established under one of these three methods, section 1170(b)(1) mandates the "imposition of a sentence not to exceed the middle term …."

Here, it is undisputed that *none* of the aggravating circumstances identified by the trial court were proven by an admission of defendant, found true by a jury beyond a

reasonable doubt, or were based on prior convictions properly established by certified records. Instead, the aggravating circumstances all related to defendant's criminal history and were based on facts gleaned solely from reference to a probation report. Even assuming each of the aggravating circumstances identified comes within the exception for prior convictions under section 1170(b)(3), the probation report does not constitute a certified record of conviction.[5] (*People v. Dunn* (2022) 81 Cal.App.5th 394, 401 (*Dunn*), review granted Oct. 12, 2022, S275655.) Absent meeting any of the criteria under section 1170(b)(2) or (b)(3), the trial court was without any legal authority to depart from section 1170(b)(1)'s preclusion on imposing a sentence exceeding the middle term. Where a sentence cannot lawfully be imposed under any circumstance in the particular case, it is unauthorized. (*Scott, supra*, 9 Cal.4th at p. 354.)

The circumstances here are analogous to fully consecutive sentences improperly imposed under section 667.6, subdivision (c). Under that statute, the sentencing court may, in its discretion, impose a full, separate and consecutive term sentence in lieu of the sentence provided under section 1170.1 for each violation of an offense specified in section 667.6, subdivision (e), if the crimes involve the same victim on the same occasion. (§ 667.6, subd. (c).) In that context, the trial court exceeds its legal authority to impose a full, separate consecutive sentence under section 667.6, subdivision (c), if all the necessary prerequisites for such a discretionary choice are not met. (See *People v. Goodliffe* (2009) 177 Cal.App.4th 723, 726, 732 [vacating as unlawful trial court's discretionary election to impose fully consecutive sentence under § 667.6, subd. (c), because the requirements for that sentencing choice were not satisfied]; see also *People v. Maharaj* (2012) 204 Cal.App.4th 641, 649–650 [finding fully consecutive sentences were not unauthorized because although § 667.6, subd. (c), requirements were not met, the

---

[5]      To the extent defendant's performance on probation supervision is *not* a circumstance that comes within section 1170(b)(3)'s exception for prior convictions, it was neither admitted nor found true by a jury beyond a reasonable doubt.

requirements of § 667.6, subd. (d), were and that statute mandated fully consecutive sentences].) Since section 1170(b)(1) now precludes the imposition of a term exceeding the middle term unless specific prerequisites are met, an upper term sentence imposed in the absence of any necessary prerequisites is arguably an unauthorized sentence to which a harmless error analysis does not apply.

On the other hand, at least one court has applied a harmless error analysis to evaluate an upper term sentence imposed under very similar circumstances. In *Zabelle*, none of the aggravating circumstances the trial court relied on to impose an upper term were proper under newly amended section 1170. (*Zabelle, supra*, 80 Cal.App.5th at p. 1114.) The defendant had not stipulated to any of the facts underlying the aggravating circumstances, a jury had not found any of them true beyond a reasonable doubt, and although the court was permitted to rely on the defendant's prior convictions, the court relied solely on the probation report and not any certified records of conviction. (*Ibid.*) The court concluded this violated state law and reasoned a harmless error analysis under *Watson* applied to assess the prejudice stemming from the violation. (*Zabelle, supra*, at p. 1115, citing *People v. Avalos* (1984) 37 Cal.3d 216, 233 [applying *Watson* harmless error analysis to consider prejudice stemming from improperly considered sentencing factor].) The court concluded the state law errors could not be deemed harmless. (*Zabelle, supra*, at p. 1115.) In doing so, the court noted that where the record is insufficient to support a trial court's finding about a defendant's criminal history—i.e., because that finding was based solely on a probation report—it would not presume the existence of extra-record materials to address the insufficiency. (*Ibid.*, fn. 6.)[6]

---

[6] Other courts, including this court, have applied a harmless error analysis to assess the prejudicial effect of improperly considered aggravating circumstances under amended section 1170(b). (See *Dunn, supra*, 81 Cal.App.5th at p. 411, review granted [applying a *Watson*-style harmless error analysis to assess prejudice from one improperly considered aggravating circumstance]; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465–466 (*Lopez*) [applying harmless error analysis adapted under *Chapman v. California* (1967) 386 U.S. 18 to assess prejudice stemming from several improperly considered aggravating circumstances].)

In the circumstances of this case, we need not decide whether the trial court's error resulted in an unauthorized sentence or whether it is amenable to a harmless error analysis as *Zabelle* concluded. No matter how the error is analyzed, resentencing is required. In the case of an unauthorized sentence, the harmless error analysis does not apply (*People v. Cabrera, supra*, 21 Cal.App.5th at p. 478), and remand for resentencing is necessary to address the error (*People v. Buycks* (2018) 5 Cal.5th 857, 893). Upon full resentencing, the People will be able to present additional evidence relevant to sentencing, such as certified records, for the trial court's renewed consideration.

Alternatively, if the upper term sentence imposed here is viewed as one otherwise permitted by law but imposed in a procedurally or factually flawed manner, then it is a forfeitable legal claim subject to a harmless error analysis. (*Scott, supra*, 9 Cal.4th at p. 354.) Here, all three of the aggravating circumstances articulated by the trial court related to defendant's criminal history, but none were properly proven or established pursuant to the statute. There is no certainty what the extra-record evidence may establish, and any reliance on the probation report to make assumptions about extra-record evidence is wholly speculative, as the People concede. (*Zabelle, supra*, 80 Cal.App.5th at p. 1115, fn. 6.) Moreover, any notion that a trial court's sole reliance on a probation report to make findings under section 1170(b)(3) can be deemed harmless subverts the statute and effectively eliminates its certified records requirement. Any iteration of the harmless error test applied in this situation indicates prejudice—i.e., a

However, neither *Dunn* nor *Lopez* involved a situation where *none* of the aggravating circumstances were properly considered under state law. When there is at least one aggravating circumstance proven or established properly, the trial court has discretion to find an upper term sentence is justified. (See *Lopez, supra*, at p. 467 ["unquestionably the trial court may still rely on any single permissible aggravating factor to select an upper term sentence under the newly revised triad system"].) However, if there are *no* aggravating circumstances that are proven or established according to sections 1170(b)(2) or (b)(3), section 1170(b)(1) prohibits the trial court from imposing an upper term sentence. In this latter circumstance, defendant has posed the question whether the sentence is unauthorized because the trial court was wholly without legal authority to impose an upper term sentence.

reasonable probability defendant would have obtained a more favorable result absent the errors. (See *People v. Avalos, supra*, 37 Cal.3d at p. 233; compare *Zabelle, supra,* 80 Cal.App.5th at pp. 1112, 1115 & *Dunn, supra*, 81 Cal.App.5th at pp. 409–410, review granted, with *Lopez, supra*, 78 Cal.App.5th at pp. 465–466.) Under these circumstances, the imposition of an upper term based on aggravating circumstances considered in noncompliance with section 1170(b)(2) and (b)(3) cannot be deemed harmless.

As the sentence prejudicially violates state law and resentencing is required, we do not reach the question whether imposition of the upper term also violates defendant's Sixth Amendment right to a jury trial. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 ["Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."].)[7]

## DISPOSITION

The convictions are affirmed, but the sentence is vacated. The matter is remanded to the trial court for a full resentencing hearing where further evidence and argument may be received regarding the sentence to be imposed. (*People v. Buycks, supra*, 5 Cal.5th at

---

[7] Defendant argues the upper term sentence is unauthorized, which is an issue not subject to forfeiture, and the People do not make a claim of forfeiture. As we have addressed defendant's claim on the merits, we do not reach defendant's alternative argument that his counsel was ineffective in failing to object to the trial court's reliance on improperly proven or established aggravating circumstances.

p. 893 [when part of a sentence is stricken, full resentencing as to all counts is appropriate so the court can exercise its discretion in light of changed circumstances].)


                                                                    MEEHAN, J.

WE CONCUR:


FRANSON, Acting P. J.


PEÑA, J.